# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

AES THAMES, L.L.C.,[1]

          Debtor.

Chapter 11

Case No. 11-10334 (___)

## DECLARATION OF BRIAN CHATLOSH
## IN SUPPORT OF FIRST DAY MOTIONS

I, Brian Chatlosh, declare as follows:

1.      I am the President of AES Thames, L.L.C. ("Debtor" or the "Company"), a debtor in possession in the above-captioned chapter 11 case. I am duly authorized to submit this Declaration on behalf of the Debtor.

2.      As a consequence of my position with the Debtor, I have reviewed and worked extensively with the books and records of the Debtor, including its business plans, financial statements and projections, business analyses and reports, contracts and other legal documents, notes, correspondence, and other business records. On a regular basis, I participate in negotiations with vendors and other creditors of the Debtor, and work closely with personnel from all aspects of the Debtor's business operations to assist in the management of the Debtor's affairs.

3.      Based upon all of the foregoing, I have developed an intimate familiarity with: (i) the Debtor's books and records, which are maintained in the ordinary course of business under my supervision and control as custodian (and under the control of other members of senior management), (ii) the Debtor's business and financial history, and its current business and financial situation, (iii) the financial and operational details of the Debtor's business operations,

---

[1] The Debtor's Tax I.D. No. is xx-xxx8195. The address for AES Thames, L.L.C. is 141 Depot Rd., Uncasville, CT 06382.

and (iv) the industry generally.

4. I submit this Declaration in support of the "first day" motions and applications (collectively, the "First Day Motions") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the Debtor's chapter 11 case. I am familiar with the contents of each of the First Day Motions (including the exhibits thereto) and I believe each of the First Day Motions is (a) necessary to enable the Debtor to enter and operate in chapter 11 with minimum disruption and loss of productivity or value and (b) is in the best interests of the Debtor's estate, creditors and stakeholders.

5. Part I of this Declaration provides the Debtor's background, capital structure and a summary of the events leading to the bankruptcy case and Part II provides the relevant facts supporting the Debtor's First Day Motions.

## PART I

## BACKGROUND

6. On the date hereof, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the Bankruptcy Court.

7. The Debtor is operating its business and managing its property as a debtor in possession pursuant to Bankruptcy Code Sections 1107 and 1108. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

**The Debtor's Business**

8. The Debtor owns and operates a coal-fired power plant (the "Facility") located in Montville, CT. The Facility generates and sells electricity to Connecticut Light and Power Company ("CL&P") pursuant to a long term contract between CL&P and the Debtor. The Facility also supplies processed steam, which otherwise would be used in the production of

electricity, to a recycled paperboard mill located adjacent to the Facility that is owned by the Smurfit Stone-Container Corporation ("Smurfit"). The Company currently has forty-three (43) salaried and hourly employees.

9.      The Debtor is a wholly-owned subsidiary of AES Connecticut Management, Inc. ("AESCI"), which in turn is a wholly-owned subsidiary of The AES Corporation ("AES"). AES is a global power company with a portfolio of electricity generation and distribution business on five continents in twenty-nine (29) countries, with total electricity generation capacity of approximately 40,300 MW and distribution networks serving over 11 million people as of December 31, 2009. AES's generation assets are diverse, employing a broad range of fuels, including coal, gas, fuel oil, biomass and other renewable sources such as hydropower, wind and solar. The AES organization is structured into geographic regions, and each region is led by a regional president. The Debtor is part of the North America region.

10.     AES was one of the early entrants to the independent power producer ("IPP") industry in the United States. The passage of the Public Utility Regulatory Policy Act ("PURPA") in 1978 opened the door for IPP's to construct and operate electricity generation facilities, and required incumbent electric utility companies to purchase the output from such facilities. PURPA exempted qualified IPP's from the provisions of the Public Utility Holding Company Act ("PUHCA"), which previously imposed onerous registration barriers to anyone attempting to enter the wholesale electricity generation business. In order to qualify under PURPA, IPP projects needed to meet certain requirements and obtain qualifying facility ("QF") status. The Debtor operates one of the first QF facilities to be developed, constructed and operated by AES and has consistently achieved availability levels above 90% while maintaining superior performance with respect to safety.

11.     The Facility is capable of delivering 181 MW to the New England electricity grid ("ISO-NE") net of station uses and transformer losses, which is sufficient to meet the demands of approximately 100,000 homes. All deliveries of power and operation of the Facility must conform to the rules of ISO-NE. The primary raw material used in the production of the electricity from the Facility is bituminous coal that is shipped to the Facility by rail and barge. Other significant raw materials include limestone, which is injected into the boiler to absorb sulphur and reduce $SO_2$ emissions, and fuel oil, which is used primarily during start-up. By-products from the combustion of coal to produce electricity include ash and air emissions. The majority of the Facility's ash is used beneficially in licensed mine reclamation projects and a portion is used to create a variety of other beneficial post-combustion reuse products. The Facility meets stringent state and federal requirements with respect to air emissions, including the recently imposed $CO_2$ requirements under the Regional Greenhouse Gas Initiative (the "RGGI").

12.     The process used by the Facility to generate electricity is an advanced coal combustion technology known as circulating fluidized bed ("CFB") combustion. The benefits of CFB technology are primarily with respect to reduction in emissions and fuel flexibility. The Facility consists of two Alston CFB boilers, one Toshiba steam turbine which powers one Toshiba hydrogen-cooled generator.

## Assets and Liabilities

### A.     Assets

13.     Based on the Debtor's unaudited, consolidated balance sheet, as of December 1, 2010, the Debtor's assets total approximately $162 million, including the following on a book-value basis: (a) net property and equipment of approximately $140 million; (b) inventories of

approximately $6.8 million; (c) accounts receivable of approximately $3.75 million; (d) cash and cash equivalents of approximately $11.18 million; (e) net intangible assets of approximately $264,000; and (e) other assets (including deposits or prepaid expenses) of approximately $410,000.

**B.    Secured Debt**

14.    <u>CL&P Security Agreement</u>.    On December 6, 1985, AES Thames, Inc. (the predecessor to the Debtor, "<u>ATI</u>") and CL&P (collectively, the "<u>Parties</u>") entered into an Electricity Purchase Agreement (the "<u>EPA</u>"), pursuant to which the Debtor agreed to provide electricity to CL&P over an extended period of time.    In connection therewith, the Parties and certain banks entered into a security agreement dated as of November 30, 1990 (the "<u>Original Security Agreement</u>") pursuant to which ATI pledged certain assets as security for the repayment of certain indebtedness incurred in connection with the construction of the Facility.    In the late 1990's, after the enactment of Connecticut Public Act 98-28, An Act Concerning Electric Restructuring (the "<u>Restructuring Act</u>") and in connection with decisions of the Connecticut Department of Public Utility Control (the "<u>DPUC</u>") directing CL&P to mitigate customer impact of electricity purchase agreements, CL&P determined that it would be in the best interests of its customers to prepay a portion of the cost of electricity provided under the EPA.    Consequently, on September 30, 1999, the Parties entered into the First Amendment to Electricity Purchase Agreement (the "<u>Amended EPA</u>"), which provided for CL&P to prepay the Company for the future cost of electricity and for the Company to sell power to CL&P at a reduced price.    The Amended EPA also reduced the price of power sold to CL&P.

15.    Subsequent to the satisfaction of the outstanding obligations under the Original Security Agreement, the Parties entered into that certain Amended and Restated Security

Agreement dated as of June 15, 2001 (the "Security Agreement"), which granted CL&P a first priority lien on, among other things, the Facility, all equipment, inventory, accounts or claims, contract rights, licenses and permits, insurance policies, any of the Debtor's property, and all replacements, products and proceeds of any of the foregoing (collectively, the "Prepetition Collateral"). Security Agreement § 1. CL&P filed its UCC Financing Statement in Delaware on April 24, 2008 (the "Financing Statement"), setting forth the terms of the Security Agreement and the collateral alleged to be secured thereby.[2]

16.     As of the date hereof, the Debtor has no liquidated claims under the EPA and there are no amounts are due to CL&P pursuant to the EPA or otherwise.

17.     Komatsu.  Komatsu Financial Limited Partnership ("Komatsu") asserts a security interest in a certain piece of equipment, a Komatsu D155AX-6 Crawler Dozer.  Komatsu filed a UCC-1 with the State of Delaware on November 3, 2008.

### C.     Unsecured Debt

18.     Based upon the Debtor's unaudited, consolidated balance sheet, as of December 31, 2010, the Debtor's unsecured debt included (A) approximately $52 million in short term liabilities, consisting of, *inter alia*, approximately $2.5 million owing to vendors of goods and services in connection with the operation of the Debtor's business, approximately (i) $156,000 in taxes, (ii) $6.5 million in contingent liabilities and reserves, and (iii) $42.3 million in unsecured accrued employee obligations, and (B) total long term liabilities of approximately $122.6 million, consisting of, *inter alia,* approximately $2.1 million in accrued asset retirement obligations and approximately $120 million in deferred income.

---

[2] The foregoing is neither intended nor shall be deemed to be an admission with respect to the validity, priority or extent of any security interest or lien asserted by CL&P against the Debtor's property.  The Debtor reserves all rights with respect to such matters.

**D.     Equity Interests**

19.     As set forth above, the Debtor is wholly-owned by AESCI.

**Events Leading to Bankruptcy**

20.     Two interrelated factors have led to commencement of this Chapter 11 case: (a) the increased cost of energy production and (b) uneconomic and onerous provisions of that certain Steam Sale Agreement between Smurfit's predecessor and ATI (the "SSA"), and the Amended EPA. Given the present and anticipated economic situation in which Debtor finds itself, as further described below, on January 24, 2011, the Company provided notice to Smurfit and CL&P that it planned to temporarily shut down the Facility as of January 26, 2011 (the "Notice"). The Facility is currently in a "wet lay up" condition, capable of restarting upon one week's notice, and still considered to be reserve capacity within the NE-ISO.

Increased Cost of Production

21.     The variable cost of production of electricity from the Facility has increased substantially over the past decade, rising from $37.09/MWh in 2000 to $53.81/MWh in 2009, largely due to: increased (a) cost of coal, (b) transportation costs and (c) environmental compliance costs affecting ash disposal and the need to purchase $CO_2$ allowances in compliance with the RGGI. In the past several years, the Debtor has decreased its fixed costs by 30%, but such reduction has not offset the variable cost increase.

22.     Given these cost issues, the Debtor has been cash negative since 2005. Each year since 2005, AES has invested additional equity into the Debtor to cover cash losses, based on the expectation that the Facility would have significant value operating as a merchant EWG (exempt wholesale generator), selling power into the NE-ISO after the expiration of the Amended EPA in 2015. However, the original expected cash amounts have continued to grow due to the increased

costs of production outlined in the preceding paragraph. AES has advised that it does not intend to contribute further equity to offset existing and anticipated costs.

Unprofitable EPA Amendment

23.     As set forth above, the EPA Amendment reduced the price of power the Debtor sells to CL&P and enabled the Company to satisfy all of its outstanding secured obligations. While it was originally believed that without any secured debt, the reduced price would not significantly affect the Company's profitability, the increased costs of production have negatively impacted the Debtor's operations and ability to operate profitably.

Unprofitable SSA and Smurfit's Commencement of Litigation

24.     The Facility has operated as a "Qualifying Facility" under PURPA, which required the sale of steam as a condition to sell electricity to CL&P. Thus, although steam production represents only approximately 5-10% of the Facility's capacity (with the other 90-95% going to electricity generation for CL&P), the PURPA requirement gave Smurfit significant leverage in the negotiation of the SSA, resulting in terms that include steam prices well below the cost of production, a fifty-year term, and several onerous penalty provisions for the failure to provide steam which severely limit the Facility's operational flexibility. In 2005, PURPA was modified significantly and PUHCA was repealed by the Energy Policy Act, enabling an IPP such as the Company to operate as an exempt wholesale generator (an "EWG") without also having to be a Qualifying Facility. Consequently, the Company can now operate as an EWG and sell electricity to CL&P without also having to sell steam to Smurfit under the onerous terms of the SSA.

25.     In addition, on November 25, 1986, predecessors to Smurfit and the Debtor entered into that certain Ground Lease (the "Smurfit Lease"), pursuant to which the land upon

which the Facility is located (owned by Smurfit), is leased to the Debtor for the purpose of operating the Facility. The Smurfit Lease contains a penalty clause that imposes increased rent as damages for a termination of the SSA that results from a "willful breach" of the same.

26. On January 26, 2011, after receiving the Notice, Smurfit filed a complaint (the "Complaint") against the Debtor in the Superior Court for the Juridical District of New London, Connecticut (the "Connecticut Court"). In the Complaint, Smurfit has requested the entry of a temporary restraining order, a preliminary and a permanent injunction requiring the Debtor to provide Smurfit with steam pursuant to the SSA, which would force the Debtor to continue to operate at a loss. At a conference on January 31, 2010, the Connecticut Court scheduled a hearing on February 2, 2011 on Smurfit's request for a temporary restraining order.

27. Against this backdrop, and although the Debtor believes it has significant defenses to the relief requested in the Complaint, the Debtor has filed for chapter 11 protection in order to reorganize and maximize value for its creditors and stakeholders. Although the Debtor cannot operate profitably in the current environment and under its existing contracts, this bankruptcy proceeding will provide the Debtor with a breathing spell from prepetition litigation and afford it an opportunity to restructure its obligations. The Debtor is considering all options available to it, including using provisions of the Bankruptcy Code to reject and/or renegotiate the Amended EPA and reject the SSA; it is the Debtor's intent to emerge from bankruptcy protection able to operate profitably and take advantage of opportunities available to it in the new regulatory environment, including, without limitation, as a merchant EWG selling electricity into the NE-ISO.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

A.  **Motion of the Debtor and Debtor in Possession for an Order (A) Authorizing Debtor to Maintain Existing Cash Management System, Bank Accounts and Business Forms; (B) Granting an Interim Waiver of certain aspects of the Requirements Contained in Bankruptcy Code section 345(b); and (C) Providing for Other Related Relief**

28.     The Debtor manages the finances of its operations through the maintenance of a centralized cash management system. Specifically, the Debtor has four (4) bank accounts (collectively, the "Bank Accounts") at Bank of America (the "Depository Bank"). The Bank Accounts are essential to the Debtor's ongoing operations and the interruption of its cash management system would be detrimental.

29.     Essentially, all of the Debtor's income is deposited into its main operating account. The Debtor than transfers funds into either the payroll account or the two accounts payable accounts (checking and wire accounts) necessary to satisfy the relevant outstanding obligations (collectively, the "Cash Management System").

30.     The Debtor's transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of this case. The Debtor has instructed or is in the process of instructing Bank of America to dishonor all checks drawn and outstanding on the Bank Accounts, unless such payment is subject to a pending first day motion. The Debtor will not pay, and Bank of America will be instructed not to pay, any prepetition debts other than those specifically authorized by this Court.

31.     I believe that the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtor's business needs and operations. To require the Debtor to close the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtor's estate.

Moreover, permitting the Debtor to continue using its existing Bank Accounts is essential to a smooth and orderly transition of the Debtor into chapter 11 and to avoid disruption of its business and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were not honored.

32.     Likewise, the commencement of this case will already place a strain on the Debtor's relationships with its employees, customers and vendors, all of whom are vital to the Debtor's continued operations and successful reorganization.  Requiring the Debtor to open all new Bank Accounts and to dishonor and reissue checks and drafts would not only cause delay, confusion and disruption in the Debtor's operations, it would also jeopardize Debtor's vital relationships with these parties in interests.

33.     The Debtor has filed, among other motions,  a motion seeking authority to pay certain outstanding employee obligations and a motion seeking authorization to pay the prepetition claims of certain critical vendors.  Accordingly, unless this motion is granted, the Debtor undoubtedly would be unable to satisfy certain checks and be forced to reissue checks to the detriment of its business and without any benefit to the estate.

34.     Consequently, I believe that maintenance of the existing Bank Accounts and Cash Management System is in the best interests of all creditors, other parties-in-interest, and the Debtor's estate.

35.     The Debtor also requests authorization to continue to use all letterhead, purchase order forms, invoice forms and any other business forms, including checks, as existing immediately prior to the Petition Date, without reference to the Debtor's status as a debtor in possession.  Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a chapter 11 debtor in possession.  Changing correspondence and business forms would

be unnecessary, expensive, burdensome, and disruptive to the Debtor's business operations. For these reasons, the Debtor has requested that it be authorized to continue using existing business forms without being required to place the label "Debtor in Possession" on each form.

36.    The cost to the Debtor and its estate in obtaining new checks and other business forms would be significant and the Debtor has already taken other measures to ensure that the policies underlying the U.S. Trustee's operating guidelines are protected by generally alerting parties-in-interest to the Debtor's chapter 11 filings. Accordingly, I believe that the requested relief is necessary to preserve the Debtor's estate.

37.    As discussed above and in the motion, all of the Debtor's Bank Accounts are ordinary depository accounts maintained for operational and not investment purposes. At times, the individual balance in the Bank Accounts may exceed the current limits of governmental insurance. Therefore, these accounts may be subject to the bonding or collateralization requirements of Bankruptcy Code section 345(b) and the U.S. Trustee's Guidelines unless those requirements are waived.

38.    I believe it would be in the best interests of the estate's creditors to continue following the existing deposit practices, notwithstanding the requirements of Bankruptcy Code section 345(b) and the U.S. Trustee Guidelines. I further submit that the Debtor's deposit practices are commercially reasonable, appropriate and consistent with the intent of Bankruptcy Code section 345.

39.    For these reasons, I believe that authorizing the Debtor to maintain the existing Cash Management System, Bank Accounts, and Business Forms, and granting an interim waiver of the requirements contained in Bankruptcy Code section 345(b) is in the best interest of the Debtor, its estate and creditors.

**B.**   **Motion of the Debtor and Debtor in Possession for an Order Under Bankruptcy Code Sections 105(a) and 507(a) Authorizing Payment of Certain Prepetition Employee Obligations and Honoring of Prepetition Employee Policies and Benefits**

40.     The Debtor employs approximately forty-three (43) individuals, including thirty-two (32) hourly employees and eleven (11) salaried employees (collectively, the "Employees").

41.     Prior to the Petition Date and in the ordinary course of its business, the Debtor provided its employees with wages, salaries, vacation time, and other compensation and benefits as further described herein (the "Employee Obligations").

42.     Automatic Data Processing, Inc. ("ADP") processes the Debtor's payroll and all Employee Obligations based upon data transmitted to it from the Debtor's corporate headquarters. ADP tallies the amounts necessary to fund payroll (including payroll taxes) and other Employee Obligations and requests that the Debtor transmits the necessary funds to ADP. After receipt of the funds from the Debtor, ADP issues checks to the Employees and makes other payments from its own accounts on account of substantially all of the Employee Obligations.

**a.**   **Employee Compensation**

43.     The Employees are paid on an hourly or salary basis on the fifteenth and last day of each month. ADP pays the Employees either through direct deposit or by check drawn on a payroll account maintained by ADP, from funds received by the Debtor.

44.     The Employees' last pay day was January 31, 2011 for the period from January 15, 2011 through and including January 31, 2011. Therefore, as of the Petition Date, the Employees have been paid for all work performed prior to the Petition Date, except for approximately $20,000 in outstanding over-time pay, which is not due until the next payroll.

45.     Given that the last payroll distribution was made on the Petition Date immediately prior to the filing of the petition, and the transfer of funds to ADP, I do not believe that any

amounts remain outstanding. However, the Debtor seeks authority to authorize satisfaction of any checks that may not have cleared as of the Petition Date.

46. None of the Employees is owed more than $11,725 in accrued and unpaid wages or salary. All of the outstanding wages and salary were earned within 180 days of the Petition Date.

47. The Debtor also withholds from Employee pay certain payments due to third parties for child support, bankruptcy and garnishments (the "Garnishments"). ADP makes all third party payments for the Garnishments on the same day as payroll. As of the Petition Date, I do not believe there are any outstanding Garnishments.

48. In addition, as of the Petition Date, I do not believe there are any outstanding amounts due to government agencies with respect to the above prepetition wages and salary for payroll-related withholding obligations and taxes (including income tax withholding, Medicare, social security, unemployment taxes, and the like) (the "Withholding Obligations").

**b. Personal Time Off**

49. The Employees are also eligible for personal time off ("PTO") to be used at the Employee's discretion for vacation, shopping, personal appointments, sickness or any other reason.

50. PTO is awarded based on the length of employment with the Debtor or an affiliated entity. Employees initially earn 120 hours per year through their sixth year of employment at the Debtor or an affiliated entity. During the seventh, eighth, ninth and tenth years with the Debtor or an affiliated entity, Employees earn 128 hours, 136 hours, 144 hours and 160 hours of vacation, respectively. Employees earn 160 hours of vacation for each year following their tenth year. In no event will an employee's PTO exceed 160 hours per year.

51. As of the Petition Date, the Debtor's Employees collectively have accumulated

approximately $113,000 in PTO. The Debtor intends to honor accrued PTO days in the ordinary course of business. None of the Employees shall receive an aggregate amount in excess of the statutory cap of $11,725.00 under Bankruptcy Code section 507(a)(4) on account of PTO, wages and salary.

**c.    Employee Benefits**

52.    As part of the compensation package provided to Employees, the Debtor offers various employee benefits and policies that provide the Employees with medical, dental, vision, workers' compensation, life insurance and other benefits (collectively, the "Employee Benefits"). The Employee Benefits may be conditioned upon the Employee's hire date or length of service. Insurance companies and other benefit providers provide most of these benefits to the Debtor's employees. Most of the Employee Benefit programs are sponsored and managed by AES. The full cost of the Employee Benefits are paid by the company to ADP in connection with the payroll process, and reimbursed to AES.

**i.    Medical Benefits**

53.    The Debtor offers medical benefits (including, where applicable, prescription, dental, and vision benefits) to Employees under various plans. Each of those plans is generally described below.

*Medical Plan*

54.    The Debtor maintains premium-based medical coverage for eligible employees through Anthem Blue Cross Blue Shield (the "Medical Plan"). These employees contribute toward the coverage through payroll deductions, with the Debtor paying the balance of the premiums. The Debtor allows its employees to opt out of the Medical Plan. Any employee opting out of the Medical Plan receives a $60 credit. All premiums are satisfied through ADP. As of the Petition Date, I do not believe the Debtor owes any premiums for this coverage and all

amounts needed to pay the premiums have been transferred to ADP.

*Dental Plan*

55.     The Debtor maintains premium-based dental coverage for eligible employees through MetLife (the "Dental Plan"). These employees contribute toward the coverage through payroll deductions, with the Debtor paying the balance of the premiums. The Debtor allows its employees to opt out of the Dental Plan. Any employee opting out of the Dental Plan receives a $4 credit. All premiums are satisfied through ADP. As of the Petition Date, I do not believe the Debtor owes any premiums for this coverage and all amounts needed to pay the premiums have been transferred to ADP.

*Vision Plan*

56.     The Debtor maintains premium-based vision coverage for eligible employees through Vision Plan Services (the "Vision Plan"). These employees contribute toward the coverage through payroll deductions, with the Debtor paying the balance of the premiums. All premiums are satisfied through ADP. As of the Petition Date, I do not believe the Debtor owes any premiums for this coverage and all amounts needed to pay the premiums have been transferred to ADP.

**ii.      Disability Insurance**

57.     The Debtor provides short-term and long-term disability insurance to all employees through Prudential Insurance Company of America. The Debtor pays the full cost of this coverage. As of the Petition Date, I do not believe the Debtor owes any premiums for this coverage and all amounts needed to pay the premiums have been transferred to ADP.

**iii.      Life Insurance**

58.     The Debtor provides life insurance through Prudential Insurance Company of

America to each Employee equal to three times (3x) the employees basic annual earnings, up to $250,000. The Debtor pays the full cost of this coverage. As of the Petition Date, I do not believe the Debtor owes any premiums for this coverage and all amounts needed to pay the premiums have been transferred to ADP.

59.     The Debtor provides Employees with the option to increase the amount of their life insurance to three times (3x) the Employee's pay up to $500,000 (the "Employee Optional Life Plan"). Employees in the Employee Optional Life Plan may also enroll their spouse or children into a dependent plan (the "Dependent Optional Life Plan"). The premiums for the Employee Optional Life Plan and the Dependent Optional Life Plan are paid by the Employee. As of the Petition Date, I do not believe the Debtor owes any premiums for this coverage and all amounts needed to pay the premiums have been transferred to ADP.

### iv.     Accidental Death & Dismemberment Plan

60.     The Debtor maintains accidental death & dismemberment coverage through Prudential Insurance Company of America (the "AD&D Plan"). The Debtor pays the full cost of this coverage. As of the Petition Date, I do not believe the Debor owes any premiums for this coverage and all amounts needed to pay the premiums have been transferred to ADP.

### v.     Workers' Compensation

61.     The Debtor maintains workers compensation coverage through Chartis Insurance Company. The Debtor pays the full cost of this coverage. As of the Petition Date, I do not believe the Debtor owes any premiums for this coverage and all amounts needed to pay the premiums have been transferred to ADP.

### vi.     401(k) Plan

62.     The Debtor offers a 401(k) plan to Employees who satisfy the plan's qualification

requirements. There are currently forty (40) participants making contributions to the 401(k) plan. Pursuant to this plan, payroll deductions are made by plan participants and forwarded by the Debtor to Merrill Lynch, the plan trustee. These funds typically are remitted by the Debtor within seven (7) days after each payroll, after the Debtor and the 401(k) administrator review and reconcile the information regarding each payroll. As of the Petition Date, approximately $20,000 in prepetition payroll deductions have been made by the Debtor in respect of the 401(k), which have not yet been remitted to the plan trustee.

63. The Debtor also matches the contributions made by Employees to the 401(k) plan, up to 5% of an Employee's pay (the "AES Contributions"). The AES Contributions vest twenty percent (20%) each year over five years.

### vii. Business Reimbursement

64. The Debtor reimburses certain of its personnel for business and travel expenses. These expenses typically result from travel between the Debtor's corporate office, corporate offices of affiliates, other facilities and business meetings. Employees sometimes pay these expenses out of pocket and subsequently seek reimbursement from the Debtor.

65. As of the Petition Date, an estimated $1,000 in reimbursable business and travel expenses had been incurred but had not been submitted for reimbursement or paid. I believe that failure to reimburse these expenses would impose an undue burden on the affected employees, who incurred those expenses with the expectation that the Debtor would reimburse them.

### viii. Miscellaneous Reimbursements

66. The Debtor reimburses Employees for certain costs related to prescription safety glasses, safety shoes, wellness programs, and tuition. Failure to reimburse these expenses would impose an undue burden on the affected employees, who incurred those expenses with the

expectation that the Debtor would reimburse them. No more than approximately $750 of this amount is estimated to be owing to Employees under these programs.

67.      I do not anticipate that the postpetition payment of Employee Obligations will create any significant, ongoing burden on its estate. I believe the Debtor will have sufficient cash on hand to pay all Employee Obligations and request that the Court authorize and direct its banks to honor all checks issued and fund transfers requested in respect of the Employee Obligations.

68.      The payment of Employee Obligations is necessary to preserve the assets of the Debtor's estate and to maintain its ongoing operations. For the foregoing reasons, I submit that granting the relief requested is appropriate and in the best interests of the Debtor's estate.

**C.**      **Motion of the Debtor and Debtor in Possession for Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; (II) Deeming Utility Providers Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment Pursuant to Bankruptcy Code sections 105 and 366 and Local Rule 9013-1(m)**

69.      The Debtor, in the ordinary course of business, pays expenses for utility services (the "Utility Services") from various companies (the "Utility Providers"). The Utility Services are essential to the Debtor's operations and, therefore, must continue uninterrupted during the pendency of this case.

70.      If the Utility Providers are permitted to alter, refuse or terminate utility services, even for a brief period, a substantial disruption of the Debtor's operations will occur, and the Debtor's business will be harmed, possibly severely. I believe such a disruption could have a devastating impact on the Debtor's business operations and revenues, and ultimately affect the Debtor's ability to maximize the value of its estate. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition charges. It is therefore critical that Utility Providers continue to provide uninterrupted utility services to the

Debtor.

71.     I submit that the Adequate Assurance Deposits, as defined in the motion, in conjunction with the Debtor's ability to pay for the future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Providers.

**D.     Motion of the Debtor and Debtor in Possession for an Order Authorizing the Payment of Certain Prepetition Claims of Critical Vendors in the Ordinary Course of Business.**

72.     The operation of the Facility requires significant and regular deliveries of coal, fuel, and other essential products, as well as continuous transportation, waste disposal, and other services (the "Products and Services").  Although the Debtor is not currently operating, the Products and Services are necessary to preserve the Facility and to ensure that the Debtor will be able to restart the Facility in an economic and safe manner.  Further, the providers of the Products and Services (the "Critical Vendors") are either the exclusive source for such Products and Services, or such Products and Services are not readily available from other parties in the Debtor's region.  Accordingly, I believe the Debtor must be able to pay the Critical Vendors in order to maintain normal operations and to prevent the risk of loss of valuable business and revenue.

73.     As of the Petition Date, I believe that approximately twenty (20) Critical Vendors are owed approximately $325,000 (collectively, the "Vendor Claims").  In addition, as of the Petition Date, approximately $25,000 of the amount owed to the Critical Vendors was for goods provided within twenty (20) days of the Petition Date and, therefore, are likely administrative claims.

74.     It is critical that the Debtor receive the Goods and Services supplied by the Critical Vendors.  I believe that any such loss will have a negative impact on the Debtor's revenue and customer good will.  Thus, I represent that the relief requested in this motion is

necessary to preserve the assets of the Debtor's estate and to maintain its ongoing operations.

**E.     Motion of the Debtor and Debtor in Possession for an Order Authorizing the Debtor's Use Of Cash Collateral**

75.     As set forth under Part I, above, the Debtor has two secured creditors: (i) CL&P and (ii) Komatsu.  Komatsu asserts a security interest in a certain piece of equipment, a Komatsu D155AX-6 Crawler Dozer.   Only CL&P asserts an interest in cash collateral (the "Cash Collateral").  For the reasons explained above, CL&P has failed to properly perfect its interest in the Cash Collateral.

76.     I have concluded that the Debtor does not have sufficient available sources of cash to carry on the operation of its business without the use of the cash that may constitute Cash Collateral.  The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees and otherwise finance its operations is essential to the Debtor's continued viability and prospects for reorganization.

77.     The Debtor's access to sufficient working capital and liquidity through the use of its cash is vital to the preservation and maintenance of the going concern value of the Debtor's business for a successful reorganization.  Without continued and uninterrupted access to cash, notwithstanding CL&P's potential interest in Cash Collateral, the maintenance of the Debtor's business would not be possible, and serious and irreparable harm to the Debtor and its estate would occur.  The preservation, maintenance and enhancement of the going concern value of the Debtor are of the utmost significance and importance to a successful reorganization of the Debtor under chapter 11.

78.     I submit that the terms set forth in the above-referenced motion for the use of the Cash Collateral are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value

and fair consideration. In addition, the terms for the use of cash recognize that CL&P may claim that such cash constitutes Cash Collateral and protect any legally cognizable interest CL&P may assert.

79.    Access to cash that may constitute Cash Collateral will permit the Debtor to, among other things, preserve the value of the bankruptcy estate, continue the operation of its business in an orderly fashion, maintain business relationships with vendors, suppliers and customers, meet ongoing business payroll disbursements, maintain employee morale, comply with regulatory requirements and satisfy other working capital and operational needs. Accordingly, immediate and irreparable harm would result if the Debtor it is denied the ability to use cash that may constitute Cash Collateral, which is necessary for the Debtor to maintain its business operations and to achieve its future business objectives.

80.    Absent immediate use of cash that may constitute Cash Collateral, the Debtor would likely be unable to maintain its facility and operations to the material detriment of creditors, employees, and other parties-in-interest. The Debtor needs to ensure the availability of such working capital immediately. The Debtor anticipates using its cash to fund its day-to-day operations and to preserve value for the bankruptcy estate. This available liquidity is necessary for the Debtor to demonstrate to its customers, suppliers, vendors, and employees that it has sufficient capital to ensure ongoing business operations. Accordingly, I believe that emergency use of cash that may constitute Cash Collateral, pending a final hearing on such relief, is necessary to prevent immediate and irreparable harm to the Debtor and its creditors.

**F.    Motion of the Debtor and Debtor in Possession for an Order Authorizing the Rejection *Nunc Pro Tunc* of the Steam Sale Agreement**

81.    As set forth above, on September 24, 1986, the Debtor's predecessor entered into the SSA, which provides for, *inter alia,* steam prices well below the cost of production, a fifty-

year term, and several onerous penalty provisions for the failure to provide steam. The terms of the SSA require the Company to sell steam to Smurfit at a significant economic loss.

82. To avoid incurring additional obligations under the SSA and consuming limited resources litigating the Smurfit Action, I believe it is an exercise of the Debtor's reaonsbale business judgment to reject the SSA effective as of the Petition Date. Under the terms of the SSA, the Debtor cannot provide steam to Smurfit at a profit. I believe the SSA represents a burden to the Debtor's estate. In addition, I believe the continued litigation of the Smurfit Action only will serve to drain resources and divert the Debtor's attention from its reorganization. Accordingly, I have concluded that rejection of the SSA represents the exercise of the Debtor's sound business judgment, is in the best interest of the Debtor's estate and creditors, and should be approved pursuant to Bankruptcy Code section 365.

83. The Debtor has done or will do all that is required for rejection of the SSA *nunc pro tunc* as of the Petition Date. I have been advised that, prior to the Petition Date, the Debtor ceased providing steam to Smurfit, and the Debtor will serve notice of this Motion on the date it is filed to Smurfit's counsel by email and to Smurfit by overnight mail.

84. Based upon the foregoing facts and circumstances, I submit that the rejection of the SSA is supported by sound business judgment, and is necessary, prudent and in the best interests of the Debtor, its estate, creditors and parties in interest..

**G.** **Application of the Debtor and Debtor in Possession to Approve the Employment and Retention of Landis Rath & Cobb LLP as Counsel, *Nunc Pro Tunc* to the Petition Date, Pursuant to Section 327(a) of the Bankruptcy Code.**

85. The Debtor seeks to employ and retain Landis Rath & Cobb LLP ("LRC") as its counsel in this case. By the Application, the Debtor requests the Bankruptcy Court to approve the employment and retention of LRC, *nunc pro tunc* to the Petition Date, pursuant to

Bankruptcy Code Section 327(a) under an evergreen retainer as its counsel to perform the legal services that will be necessary during the Debtor's chapter 11 case.

86.     LRC is familiar with the Debtor's business affairs and capital structure, and will be able to immediately assist the Debtor in its efforts in this case. Accordingly, LRC has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of this case. Thus, in order to maximize the value of the Debtor's estate and because of LRC's recognized expertise in bankruptcy law, the Debtor desires that LRC represent it in this case.

87.     I believe the Debtor's employment of LRC under a general retainer is appropriate and necessary to enable the Debtor to execute faithfully its duties as Debtor and Debtor in possession and to implement a successful reorganization.

88.     For these reasons, I believe the employment and retention of LRC is necessary and in the best interests of the Debtor, its estate and creditors.

**H.      Motion of the Debtor and Debtor in Possession to Establish Procedures for Interim Compensation and Reimbursement of Expenses for Professionals Pursuant to Sections 105(a) and 331 of the Bankruptcy Code.**

89.     The Debtor has filed an application to retain Landis Rath & Cobb LLP as its counsel. The Debtor anticipates that, as this case progresses, it may need to retain other professionals in connection with its reorganization efforts. In addition, a statutory committee of unsecured creditors (the "Committee") may be appointed in this case. If appointed, the Committee will likely retain counsel, and possibly other professionals, to assist it in fulfilling its obligations in this case.

90.     The proposed compensation procedures outlined in this motion should enable professionals to be paid partial amounts owed to them while ensuring appropriate oversight, and

otherwise not unduly burdening the Bankruptcy Court, the United States Trustee and the respective Professionals. Accordingly, I submit that approving the compensation procedures is in the best interests of the Debtor's estate, creditors and other parties-in-interest.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _1_ day of _February_, 2011 at _Uncasville_, Connecticut

Brian Chatlosh